UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Stephen Gately,
      Plaintiff

      v.                              Case No. 17-cv-100-SM
                                      Opinion No. 2017 DNH 154
Mortara Instrument, Inc.,
      Defendant

## O R D E R

Plaintiff, Stephen Gately, filed this suit asserting claims
arising out of his employment by the defendant, Mortara
Instrument, Inc. ("Mortara" or the "Company").  Gately advances
claims for breach of contract, promissory estoppel, violation of
the New Hampshire Consumer Protection Act ("CPA," or the "Act"),
negligent/fraudulent misrepresentation, violation of the
Whistleblower Protection Act, wrongful discharge, and for
payment of wages.  Mortara has moved to dismiss Gately's breach
of contract, promissory estoppel and CPA claims.  The motion is
denied in part, and granted in part.

## STANDARD OF REVIEW

When ruling on a motion to dismiss under Fed. R. Civ. P.
12(b)(6), the court must "accept as true all well-pleaded facts
set out in the complaint and indulge all reasonable inferences

in favor of the pleader." <u>SEC v. Tambone</u>, 597 F.3d 436, 441 (1st Cir. 2010).  Although the complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), it must allege each of the essential elements of a viable cause of action and "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citation and internal punctuation omitted).

In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).  Instead, the facts alleged in the complaint must, if credited as true, be sufficient to "nudge[] [plaintiff's] claims across the line from conceivable to plausible." <u>Id</u>. at 570.  If, however, the "factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." <u>Tambone</u>, 597 F.3d at 442.

"Under Rule 12(b)(6), the district court may properly consider only facts and documents that are part of or

incorporated into the complaint; if matters outside the pleadings are considered, the motion must be decided under the more stringent standards applicable to a Rule 56 motion for summary judgment." Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008) (citing Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 18 (1st Cir. 1992)). "When ... a complaint's factual allegations are expressly linked to — and admittedly dependent upon — a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Id. (quoting Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16-17 (1st Cir. 1998) (additional citations omitted).

## BACKGROUND

Accepting the allegations in the amended complaint as true, the relevant facts appear to be as follows. Mortara, a diagnostic cardiology company based in Wisconsin, manufactures patient monitoring devices that are sold worldwide. Stephen Gately, a New Hampshire resident, worked as a sales executive in the field of medical devices (specifically, acute care monitoring devices) for more than a decade.

In the spring of 2016, Gately accepted a position with General Electric as a Senior Account Manager, covering all GE healthcare divisions, including its acute care patient monitoring division. Prior to accepting the position at GE, Gately interviewed with several potential employers, including Mortara. After accepting the position with GE, Gately contacted Mortara's Chief Operating Officer, Brian Brenegan, to withdraw his candidacy. Brenegan asked Gately to first speak with Mortara's president, Justin Mortara, about working for Mortara instead of GE.

Two days later, Justin Mortara and Gately spoke by telephone. They discussed the Company and its ambition to enter the acute care patient monitoring market. Intrigued, Gately agreed to visit Wisconsin to tour the Company's operations, and meet Justin Mortara and the Company's other executives in person.

During his visit, Gately spoke extensively with Mortara executives about his potential role at the Company. When Gately explained to Justin Mortara that penetrating the acute care patient monitoring market would require an investment of between $15 million and $20 million over several years, Justin Mortara

responded that the Company was prepared to make that investment, and wanted Gately to spearhead those efforts.

The next morning, Gately spoke with Brenegan. Gately expressed his misgivings about working with some of the individuals at the Company, but Brenegan assured him that his concerns would not be a problem because employee roles were changing within Mortara. Brenegan then asked Gately what it would take for Gately to turn down the position at GE, and come to work for Mortara.

Excited by the prospect of building an acute care patient monitoring division within Mortara, Gately attempted to negotiate a pay package with Brenegan that would take into account any reputational damage he might suffer as a result of withdrawing from the job he had accepted with GE. Gately and Brenegan ultimately agreed upon a pay package that would guarantee Gately compensation of $250,000 for each of his first two years of employment at Mortara, plus performance incentives and benefits. They also agreed that Gately would work from his home in New Hampshire. Gately left Wisconsin with a commitment that he would soon receive an offer letter from Mortara, setting out the terms of his employment agreement.

Six hours later, Mortara sent Gately an offer letter dated

May 2, 2016.  Written by Mortara's Human Resource Director, the

letter described the terms of Gately's employment package.  It

read, in part:

> In this role, your annual base salary will be
> $150,000, with a commission plan designed to generate
> variable compensation of $100,000 annually, which will
> be guaranteed for the initial twelve months of your
> employment by means of a non-recoverable monthly draw.
> For months 13-24, your variable compensation plan,
> again targeted to achieve $100,000 on an annual basis,
> will be paid to you by means of a monthly recoverable
> draw.  You will also receive a $650 per month car
> allowance, which will be added as taxable income to
> your bi-weekly paycheck.  Mortara will reimburse basic
> expenses for your home office, and normal out of town
> business expenses, including vehicle gas
> reimbursement.
>
> Mortara Instrument has a Phantom Stock Plan which is a
> deferred compensation vehicle designed for management
> leadership personnel to share in the growth of the
> company.  Based on the importance of your role in the
> organization, you will be eligible for consideration
> to be brought into this plan.

Compl. ¶ 18.


The May 2 letter did not explicitly state that Gately's

anticipated employment would be "at-will."  While the letter

described Gately's variable compensation for months 13-24 as a

"monthly recoverable draw," Brenegan subsequently assured Gately

that his variable compensation for that period was guaranteed at

a minimum of $100,000.  Brenegan further explained to Gately

that the phrase "recoverable draw" meant that Gately would be

6

eligible to "recover" additional variable compensation based on a commission schedule, assuming his sales during the period supported it. However, Brenegan said, Gately would not be required to disgorge any draw paid to him during the 13 to 24 month period if his sales fell below target.

Gately accepted Mortara's offer on May 2, 2016. He returned a signed copy of the offer letter to Mortara's Human Resources Director. Gately then notified GE that he was withdrawing from the job he had previously accepted. He began working for Mortara as Vice President for Patient Monitoring Sales on May 16, 2016.

Within just a few weeks of beginning work at Mortara, Gately was informed by Brenegan that Mortara was suspending its push into the acute care patient monitoring market, and had instituted several organizational changes before Gately's start date. Brenegan told Gately that, because Mortara lacked confidence in its newly assigned Vice President of Sales, Michael Shultz, Gately was expected to take on an additional role in the cardiology side of Mortara's business. Brenegan told Gately that, while he wanted Gately to "shake things up," he also needed Gately to accept Shultz as his boss for the time being. Compl. ¶ 23. Working for Shultz was a "dramatic change"

from the working relationship that Brenegan had described when the two negotiated Gately's employment contract. Compl. ¶ 24. Gately would not have accepted the contract with Mortara under that condition. Id. However, Brenegan suggested to Gately that the new assignment was only temporary, and Mortara would soon commit to investing in an acute care patient monitoring business, as promised.

In his altered role, Gately soon discovered a troubling practice by Mortara. The Company manufactured an electrocardiograph for use in physician offices, sold under the name "ELI 250c." The ELI 250c was marketed by the Company as "portable," because it was designed to be powered by a built-in, rechargeable battery. However, the batteries Mortara installed in the ELI 250c were defective, and failed almost immediately after their first use. Gately learned that Mortara's management refused to acknowledge the defect. Sales staff and customer support teams were instructed not to reveal the device's faulty batteries to customers, but to instead tell customers that the ELI 205c should only be operated when plugged in to an electrical power source, notwithstanding its claimed "portability" attribute.

Gately confronted Shultz about the practice.  Shultz responded that Gately should "suck it up," and do what he was told.  Compl. ¶ 27.  Shultz told Gately that senior leadership at the Company, including Justin Mortara, knew about the defect, but were unwilling to divert Research and Development resources to fix it.  Id.  Gately spoke with a colleague in another Mortara department about the ELI 250c defect, and his concerns regarding how the Company was handling the issue.  Gately expressed his discomfort over having to lie to customers about the problem.  Gately's colleague warned him that he would be "blackballed" within the Company if he continued to press the issue.  Compl. ¶ 27.

But, Gately's "fate at Mortara had already been sealed." Compl. ¶ 28.  Two weeks after his confrontation with Shultz, Gately was notified that his employment with Mortara was terminated effective October 28, 2016, six months into his employment.  Gately insisted that he be compensated consistently with the terms of his employment agreement (i.e., two years of guaranteed compensation and benefits), but Mortara refused.

On January 9, 2017, some two months after firing Gately, Mortara announced that it would be acquired by Hill-Rom Holdings, Inc. ("Hill-Rom").  A wholly owned subsidiary of Hill-

Rom, Welch Allyn, Inc., acquired all issued and outstanding shares of Mortara in exchange for a purchase price of $330 million.

Gately alleges, upon information and belief, that Mortara conceived of the new acute care patient monitoring division as a marketing ploy to make itself attractive to a potential buyer. Mortara then persuaded Gately to abandon his position at GE to run the division, all the while knowing that the Company had no intention of actually entering the acute care patient monitoring market. Once Mortara's negotiations with Hill-Rom were substantially complete, Mortara no longer needed to keep up the façade of building an acute patient care monitoring division. That, Gately says, combined with his refusal to "suck it up" and lie to customers about the ELI 250c battery problem, prompted Mortara to fire him and breach its obligations under the employment agreement.

Gately filed suit in state court. Mortara timely removed the action, invoking this court's diversity jurisdiction, and it now moves to dismiss.

**DISCUSSION**

As noted above, Mortara moves to dismiss the Counts I, II and III of Gately's complaint.[1]

**A.    Count I – Breach of Contract**

Mortara argues that Gately's breach of contract claim must be dismissed because the employment contract between Gately and Mortara established an "at-will" employment relationship. Mortara points out that, under both New Hampshire and Wisconsin law, an employment relationship is presumed to be at-will when the contract of employment is silent as to term.  It contends that Gately has not pled facts sufficient to overcome that presumption.

Gately responds that, as alleged, his breach of contract claim has two components.  First, he argues, he <u>has</u> sufficiently alleged that he was not an at-will employee, and that the contract provided for a two year term of employment.  Second, he says, regardless of whether he was an at-will employee, Mortara

---

[1]    The parties dispute which state's law applies to Gately's contract and promissory estoppel claims: Wisconsin or New Hampshire.  Mortara argues that Wisconsin's law applies, but concedes that New Hampshire and Wisconsin law are substantially similar with regard to the issues currently before the court. Accordingly, choice of law issues need not be resolved now.

guaranteed his compensation for two years, and then breached
that guarantee by paying him for only six months.

Whether Gately's discharge constituted a breach of contract
turns on the existence of an enforceable employment agreement.
Gately argues that he has sufficiently alleged that the parties
entered an employment contract for a definite, two-year term.
In support, he relies upon language in the May 2 letter
declaring that his variable compensation would be "guaranteed
for the initial twelve months of [his] employment," and that,
"[f]or months 13-24," the "variable compensation plan" would be
paid "by means of a monthly recoverable draw."  Compl. ¶ 18.
That language, Gately says, establishes a 24-month employment
term, consistent with the bargain Gately and Brenegan struck.

As a preliminary matter, "the interpretation of a contract
is an issue of law for this court to resolve."  Dillman v. New
Hampshire Coll., 150 N.H. 431, 434 (2003) (citing Erin Food
Servs. v. 688 Properties, 119 N.H. 232, 235 (1979)).  "The court
must first determine whether the writing is a complete
integration of the parties' agreement."  Piascik-Lambeth v.
Textron Auto. Co., No. CIV. 00-258-JD, 2000 WL 1875873, at *8
(D.N.H. Dec. 22, 2000) (citing MacLeod v. Chalet Susse Intl.,
Inc., 119 N.H. 238, 243 (1979)).  "The court then interprets the

agreement by giving the language its reasonable meaning in light of the circumstances and context existing at the time of the agreement and reading the agreement as a whole." Id. (citing Keshishian v. CMC Radiologists, 142 N.H. 168, 177 (1997)).

Gately says that, despite the May 2 letter's description of his variable compensation for months 13-24 as "monthly recoverable draw," Brenegan told him that such compensation was guaranteed at a minimum of $100,000, and that he would not be required to disgorge any draw paid to him during that period. Compl. ¶ 19. But, those allegations are not particularly useful in determining whether Gately's employment status was at-will. In his opposition to Mortara's motion to dismiss, Gately relies entirely on the terms of the May 2 letter as fully describing the employment agreement.

Under New Hampshire law, "the at-will status of an employment relationship is 'one of prima facie construction.'" Smith v. F.W. Morse & Co., 76 F.3d 413, 426 (1st Cir. 1996) (quoting Panto v. Moore Business Forms, 130 N.H. 730, 739 (1988)). "That is to say, unless an employment relationship explicitly provides for a definite duration, it is presumed to be at-will." Id. (citing Butler v. Walker Power, 137 N.H. 432, 435 (1993)). And, if an "employment contract is silent as to

the duration of employment, the employee is at will, despite an express agreement as to other terms of employment." Sheeler v. Select Energy & NEChoice, LLC, No. 03-59-JD, 2003 WL 21735496, at *7 (D.N.H. July 28, 2003) (citing National Employment Serv. Corp. v. Olsten Staffing Serv., 145 N.H. 158, 162 (2000)); see also Piascik-Lambeth v. Textron Auto. Co., 2000 WL 1875873, at *7 ("When no provision for the duration of employment is made in a contract, the employment relationship status is presumed to be at-will.") (citing Butler, 137 N.H. at 435).

The employment agreement between Gately and Mortara is plainly silent as to the duration of his employment. Gately, however, attempts to read a two-year term into the agreement, based on the agreement's compensation language. But, generally, "[a] hiring at so much a day, week, month or year, no time being specified, is an indefinite hiring, and no presumption attaches that it was for a day even, but only at the rate fixed for whatever time the party may serve." Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 919 (1981) (quoting H.G. Wood, A Treatise on the Law of Master and Servant § 136, at 283-84 (2d ed. 1886)); see also Forrer v. Sears, Roebuck & Co., 36 Wis. 2d 388, 393 (1967) ("Generally speaking, a contract for permanent employment, for life employment, or for other terms purporting permanent employment, where the employee furnishes no

consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and a discharge without cause does not constitute a breach of such contract justifying recovery of damages. The same is true where the contract of hiring specifies no term of duration but fixes compensation at a certain amount per day, week, or month. Although not absolute, the above stated rule appears to be in the nature of a strong presumption in favor of a contract terminable at will unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other.") (internal citations omitted).

Gately construes his agreed-upon compensation over his first two years of employment as an agreement to retain him for a definite term of two years. He points out that some courts have found like provisions consistent with a hiring for a definite period. See, e.g., Pauza v. The Standard Grp., Inc., No. CIV.A. 06-2608 (JAG), 2006 WL 3359421, at *4 (D.N.J. Nov. 20, 2006) ("By setting forth Plaintiff's agreed-upon compensation in detail through December 31, 2006, the agreement is certainly consistent with a hiring for a definite period as opposed to an employment at-will.") (internal quotations omitted) (applying New York law).

Given the employment agreement at issue here, Gately's argument is unconvincing.  The offer letter lacks any provision tending to establish a fixed term of employment or undermine the at-will presumption.  Second, the compensation provisions upon which Gately relies cannot reasonably be interpreted as describing a definite term, nor do they give rise to an ambiguity with regard to Gately's employment status.  That language relates not to the durational status of Gately's employment, but rather to "the incidents of employment such as compensation and fringe benefits."  Butler, 137 N.H. at 436.

In other words, while the agreement describes Gately's compensation over a 24-month period, it is silent as to the duration of his employment.[2]  Terms of compensation are distinct from terms of duration.  As the New Hampshire Supreme Court has noted: "there are contractual elements that exist independently of, or within, the durational status of the employment relationship.  Regardless of whether an employment relationship is at-will or tenured, there still exist the incidents to such

_____

[2]     To the extent Gately might argue that circumstances surrounding the creation of his employment agreement support a finding that the parties intended the contract to be for a two year employment term, he has not sufficiently alleged such circumstances.  Indeed, Gately's allegations do not mention any purported discussion about or negotiation of a two-year employment term between the parties.  See Compl. ¶¶ 13-19.

employment.  These incidental benefits must be considered separately from the duration itself." Butler, 137 N.H. at 436.

Nevertheless, relying on Butler v. Walker Power, 137 N.H. 432, Gately contends that, even if his employment is presumed to have been at-will, he has still stated a claim that Mortara breached a contract for guaranteed compensation.  Gately argues that the employment agreement "guaranteed" his annual base salary, plus variable compensation of $100,000, for the initial 12 months; and, for months 13-24, the employment agreement further guaranteed variable compensation of $100,000.

While it is apparent that Gately's compensation was clearly defined, and "guaranteed" in the sense that had he continued in Mortara's employment, he would be entitled to be paid as provided, still, that "guarantee" does not operate as a guarantee that he would be so compensated whether he worked or not, nor does it constitute a "guarantee" that he would be kept on as an employee for the period covered by the defined compensation formula, as no fixed term was agreed upon and the at-will presumption governs.

Accordingly, defendant's motion to dismiss plaintiff's breach of contract claim is granted.

**B.**   **Count II – Promissory Estoppel**

Mortara argues that that Gately's promissory estoppel claim is based on the same allegations that form his breach of contract claim.  Because the two causes of action are mutually exclusive, Mortara says, Gately's promissory estoppel claim must be dismissed as well.

As a preliminary matter, Federal Rule of Civil Procedure 8 allows a party to assert as many separate claims as it has "regardless of consistency."  Gately's promissory estoppel claim rests on promises other than those memorialized in the employment agreement, specifically Mortara's representation that it was willing and prepared to invest the time and sufficient money to launch a new acute care patient monitoring division, which Gately would spearhead.

While the claim may face other hurdles, mutual exclusivity is not one of them.  Mortara's motion to dismiss that claim is denied.

**C.**   **Count III – Consumer Protection Act**

Finally, Mortara contends that Gately's claim under the New Hampshire Consumer Protection Act must be dismissed.  In support of that contention, Mortara first argues that Gately's CPA claim

arises from his private employment relationship with the
Company, and therefore lacks the necessary "trade or commerce"
element required by the Act.  Second, Mortara argues that Gately
has not sufficiently alleged an "unfair or deceptive act or
practice" prohibited by the Act.

New Hampshire's Consumer Protection Act, "RSA 358-A:2[,]
provides that '[i]t shall be unlawful for any person to use any
unfair method of competition or any unfair or deceptive act or
practice in the conduct of any trade or commerce within this
state.'"  Brzica v. Trustees of Dartmouth Coll., 147 N.H. 443,
451 (2002).  "'Trade or commerce' is defined under the Act as
including 'the advertising, offering for sale, sale, or
distribution of any services and any property, tangible or
intangible, real, personal or mixed, and any other article,
commodity, or thing of value wherever situated.'"  Id. (quoting
RSA 358-A:1, II).  Although the statute "casts a wide net,"
Anderson v. Century Prods. Co., 943 F. Supp. 137, 153 (D.N.H.
1996), it does not apply to transactions that are "strictly
private in nature" and are "in no way undertaken in the ordinary
course of a trade or business."  Hughes v. DiSalvo, 143 N.H.
576, 578 (1999) (quoting Lantner v. Carson, 374 Mass. 606, 373
(1978)).

The Act "lists thirteen representative categories of
unlawful acts or practices, each dealing with transactions for
the provision of goods or services to consumers." Roberts v.
Gen. Motors Corp., 138 N.H. 532, 538, 643 A.2d 956, 960 (1994).
However, the Act's application is not limited "only to these
specific transactions." Id. In determining which actions not
specifically delineated are covered by the CPA, the New
Hampshire Supreme Court has employed a "rascality" test. ACAS
Acquisitions (Precitech) Inc. v. Hobert, 155 N.H. 381, 401
(2007). "Under the rascality test, the objectionable conduct
must attain a level of rascality that would raise an eyebrow of
someone inured to the rough and tumble of the world of
commerce." Fat Bullies Farm, LLC v. Devenport, No. 2015-0692,
2017 WL 2325084, at *4 (N.H. May 26, 2017) (quotation omitted).

The New Hampshire Supreme Court has not yet resolved
whether an employer-employee relationship sufficiently affects
trade or commerce. In ACAS Acquisitions, 155 N.H. at 401, the
Court considered whether an employer's refusal to pay a former
employee's severance benefits qualified as an unfair act or
practice under the Act. The Court seemingly assumed arguendo
that, under the circumstances presented, the parties' conduct
adequately implicated "trade or commerce." The Court then
resolved the dispute by determining that the employer's conduct

did not sufficiently meet the "rascality" test.  Noting that the
employer had suspended benefits based on a reasonable belief
that the employee had violated restrictive covenants, the Court
found that such conduct "is not of the same type as that
proscribed by the CPA," and "suspending benefits until its
obligation to pay . . . is established does not raise an eyebrow
of one inured to the rough and tumble of the world of commerce."
Id.

Courts in this district, however, have generally held that
the Act does not apply to conflicts arising from employment.
See, e.g., Bartholomew v. Delahaye Grp., Inc., No. CIV. 95-20-B,
1995 WL 907897, at *10 (D.N.H. Nov. 8, 1995); Donovan v. Digital
Equip. Corp., 883 F. Supp. 775, 787 (D.N.H. 1994) (finding that
plaintiff's relationship with defendant "was, in form and
essence, an employment relationship and, as a result, disputes
arising from it may not be litigated under the New Hampshire
consumer protection act.").  Plaintiff appears to concede that
allegations of an employer-employee dispute would not meet the
"trade or commerce" requirement of the Act.  See, e.g., Pl.'s
Br. in Supp. of Obj. to Mot. to Dismiss at 12-13 (arguing that
plaintiff has stated a viable claim under the CPA because he has
alleged more than an "employer-employee dispute").  That
matters, because much of the conduct alleged in Gately's

complaint might be seen as "inextricably linked" to his employment with Mortara. Donovan, 883 F. Supp. at 786. Specifically, Gately alleges that Mortara induced him to join the Company through false promises about entering the acute care patient monitoring market, and then unfairly terminated his employment after he expressed concerns about Mortara's ELI 250e product.

But, Gately argues, his allegations go beyond an employer-employee dispute, because he has also alleged that Mortara engaged in deceptive conduct (representing its intent to enter the acute patient care monitoring market) in order to increase the purchase price paid for its stock, using Gately as a pawn in its deceptive negotiations. Those representations, Gately says, were false and made to manipulate Gately into joining Mortara, all in an effort to persuade Hill-Rom that Mortara was prepared to expand into the acute care monitoring market. It is those allegations, Gately argues, that implicate trade and commerce under the statute. And, he says, as a result of that deceptive conduct, he was injured. In support of his argument, Gately relies on Campbell v. CGM, LLC, No. 15-CV-088-JD, 2017 WL 78474, at *12 (D.N.H. Jan. 9, 2017), in which the plaintiff alleged that the defendant induced him to leave his business and instead

work for the defendant, by making false promises of a certain salary and bonuses.

Given that RSA chapter 358-A "defines who may bring a private action broadly,"[3] Gately could potentially state a CPA claim.  See <u>LaChance v. U.S. Smokeless Tobacco Co.</u>, 156 N.H. at 94 ("If we were to conclude, as the defendants urge, that the legislature intended to allow only those directly injured to bring suit, we would have to find some way to limit the statute's scope, most likely by reading the word 'directly' into it, <u>i.e.</u> 'any person directly injured.'  This is not what the statute says, and it is not our practice to add words to statutes.") (citations omitted).  At this early stage, viewing the complaint in the light most favorable to plaintiff, accepting his factual allegations as true, and drawing all reasonable inferences in his favor, Gately's allegations are probably (barely) sufficient to satisfy the "rascality" test. As the court noted in <u>Campbell</u>, 2017 WL 78474, at *12, while "an

---

[3]     See <u>Remsburg v. Docusearch, Inc.</u>, 149 N.H. 148, 159 (2003). "According to the statute, '[a]ny person injured by another's use of any method, act or practice declared unlawful under this chapter may bring an action for damages.'"  <u>Id.</u> (quoting RSA 358-A:10); <u>see also</u> <u>LaChance v. U.S. Smokeless Tobacco Co.</u>, 156 N.H. 88, 94 (2007) ("By allowing '<u>any</u> person injured' to bring an action, the plain language of RSA 358-A:10, I does not suggest any legislative intent to limit who may bring a CPA claim to persons sustaining direct injuries.") (emphasis in original).

ordinary breach of contract claim does not show a violation of
the Act, 'a defendant who induces the plaintiff to enter a
contract based on a knowing misrepresentation of the promisor's
intent to perform under the contract violates the Consumer
Protection Act.'" (quoting Moulton v. Bane, No. 14-CV-265-JD,
2016 WL 1091093, at *12 (D.N.H. Mar. 21, 2016)). See also Derry
& Webster, LLC v. Bayview Loan Servicing, LLC, No. 14-CV-211-PB,
2014 WL 7381600, at *6 (D.N.H. Dec. 29, 2014) ("The New
Hampshire Supreme Court has consistently held that inducing
another to enter a contract based on a knowing misrepresentation
of the promisor's intent to perform under the contract violates
the CPA") (collecting cases). But see Franchi v. New Hampton
Sch., 656 F. Supp. 2d 252, 266 (D.N.H. 2009) ("broken promises
alone do not rise to the level of rascality where successful
[CPA] claims dwell."). It may turn out that the evidence
supports only a broken promise based upon a corporate decision
to change direction. But at this stage, while Gately's
allegations in support of his CPA claim appear weak, they do
withstand defendant's motion to dismiss. Accordingly, the court
declines, at this stage, to dismiss plaintiff's CPA claim. The
defendant is, of course, free to revisit the issue at the
summary judgment stage, when the factual record is developed.

## CONCLUSION

For the foregoing reasons, and for those stated in defendant's memorandum in support of its motion, defendant's motion to dismiss (document no. 3) is **GRANTED** in part, as to plaintiff's breach of contract claim. Defendant's motion to dismiss is otherwise **DENIED**.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

August 9, 2017

cc:  Jonathan M. Shirley, Esq.
     James A. McClure, Esq.
     Christopher P. Banaszak, Esq.
     Michael J. Gentry, Esq.
     William C. Saturley, Esq.